STATE OF MINNESOTA

IN SUPREME COURT

A14-1464

Ramsey County                                                          Stras, J.
                                        Took no part, Hudson, Chutich, JJ.


State of Minnesota,

                Respondent,

vs.                                                            Filed:  May 18, 2016
                                                        Office of Appellate Courts
Heather Leann Horst,

                Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

John Choi, Ramsey County Attorney, Kaarin Long, Assistant Ramsey County Attorney, Saint Paul, Minnesota, for respondent.

Deborah Ellis, Susan Johnson, Ellis Law Office, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      The appellant's statements were admissible at trial because police investigators obtained them during a non-custodial interview.

1

2.      Exigent circumstances justified the warrantless seizure of the appellant's cellphone.

3.      Even if the district court erred when it approved the search warrants for the appellant's medical records, any error was harmless beyond a reasonable doubt.

4.      Even if the district court erred when it failed to give an accomplice-corroboration jury instruction sua sponte, any error did not affect the appellant's substantial rights.

5.      The evidence was sufficient to support the appellant's conviction of first-degree premeditated murder.

6.      The district court did not abuse its discretion when it denied the appellant's request to remove a juror for cause.

Affirmed.

O P I N I O N

STRAS, Justice.

The district court convicted Heather Horst of first-degree premeditated murder and sentenced her to life imprisonment without the possibility of release.  In this direct appeal of her conviction, Horst challenges a number of decisions made by the district court, including several evidentiary rulings, the failure to give an accomplice-corroboration jury instruction, and the denial of her request to remove a juror for cause.  Horst also argues that the evidence was insufficient to convict her of first-degree premeditated murder.  We affirm Horst's conviction.

# I.

The marriage between Horst and her husband, Brandon, was troubled. During the course of the marriage, both spouses were unfaithful to one another. Horst told multiple friends that Brandon had been verbally and physically abusive toward her and that his abuse had caused multiple miscarriages, although there was no evidence presented at trial to substantiate either claim.

In the summer of 2013, Brandon's stepsister, A.P.; A.P.'s then-fiancé, Aaron Allen; S.K.; and S.K's girlfriend were living together in an apartment in South St. Paul. A.P. and Horst were acquaintances from high school, but they became particularly close that summer and spent considerable time together at the apartment. One day, Horst "came storming in" to the apartment. Allen testified that Horst was angry and that the first thing she said when she arrived was "I want him dead," referring to her husband, Brandon. Horst told Allen, A.P., and S.K. that, the night before, Brandon had punched her in the stomach, which caused her to miscarry. Upon hearing that Brandon had caused yet another miscarriage, Allen became "livid," "ang[ry]," and "saw blood."

Horst's statements led to a broader discussion among Horst, Allen, and S.K. about how Horst should deal with the alleged abuse. The discussion started with the suggestion that Horst should leave Brandon, but then quickly turned into a conversation about whether they should kill him. Horst suggested that the killing occur at night, that it resemble a burglary, and that Allen cut Brandon's throat. Horst promised to give a portion of the life-insurance proceeds from Brandon's death to Allen and S.K. Later that day, Allen's friend, K., became involved in the planning.

In preparation for the crime, Horst, Allen, S.K., and K. purchased various items from Kmart and Sam's Mini Mart, including shoes, gloves, and a shirt, each of which was to be used to avoid leaving evidence at the crime scene. Horst paid for the items at both stores. While traveling from one store to another, the group further refined their plan. At one point, at Horst's prompting, they discussed the possibility of using one of Horst's guns to kill Brandon.

S.K. and K. subsequently withdrew from the scheme. S.K. abandoned the group at Sam's Mini Mart when he saw an ex-girlfriend. Later, K. left the apartment while Allen was sleeping and took no further part in the scheme. Allen himself hesitated at one point. When Allen expressed doubt, however, Horst responded by saying, "we can do this" and "just think about the baby."

Later that evening, Horst brought Allen to her home so that they could carry out the plan. Horst gave Allen a gun, showed him it was loaded, and told him to shoot Brandon two or three times to make sure he died. At Horst's direction, Allen waited in the basement for Brandon to return home and go to bed. Horst went to the basement after Brandon got home. While Horst and Allen were discussing the crime, Allen again expressed reservations, but Horst eventually convinced him to carry out the plan. During the conversation, Horst received a call from A.P., at which point she left the house, picked up A.P., and headed to Walgreens.

After sending multiple text messages to Horst, Allen eventually left the basement and went upstairs to the bedroom where Brandon was sleeping. He opened the door, leaned into the bedroom, and shot Brandon once in the head. At trial, he testified that he could

4

not shoot Brandon two or three times, as Horst had instructed, because "once was too much." After shooting Brandon, Allen ran out of the house and sent a text to Horst stating that the job was "done."

Allen then called A.P., which caused Horst and A.P. to leave Walgreens. As they drove toward Horst's house, they spotted Allen and picked him up. After retrieving Allen, Horst first drove to a dog park, where Allen threw the gun into a river. Horst next drove Allen to his South St. Paul apartment. At one point, Horst asked Allen, "how many rounds did you put in him?" to which he replied, "just one." She also informed Allen that she had destroyed her SIM card.

After they dropped off Allen, Horst and A.P. returned to Horst's home, where Horst called 911 to report Brandon's death. Following an investigation of the crime scene, the officers took Horst and A.P. to the St. Paul Police Department Headquarters for questioning. The officers arrested Horst for Brandon's murder several days later.

The State indicted Horst on charges of first-degree premeditated murder, *see* Minn. Stat. § 609.185(a)(1) (2014); second-degree intentional murder, *see* Minn. Stat. § 609.19, subd. 1(1) (2014); and conspiracy to commit first- and second-degree murder, *see* Minn. Stat. §§ 609.175, subd. 2(3), 609.185(a)(1), 609.19, subd. 1(1) (2014). The theory of the State's case on the two murder counts was that Horst aided and abetted Allen in killing Brandon. *See* Minn. Stat. § 609.05, subd. 1 (2014). A jury found her guilty of each of the charged offenses. The district court sentenced her to life imprisonment without the possibility of release on the first-degree premeditated murder count.

## II.

The first question presented by this case is whether the district court erred when it denied Horst's motion to suppress statements from a police interview conducted shortly after Brandon's murder. Although the State did not play the recording of the interview for the jury, the district court permitted the investigator who had been present to testify at trial about the substance of the interview, including Horst's statements. Horst challenges the district court's conclusion that the statements were admissible.

The Fifth Amendment to the United States Constitution requires police officers to provide a suspect with the warnings from *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), before conducting a custodial interrogation. *See Dickerson v. United States*, 530 U.S. 428, 434-35 (2000). In the absence of these warnings, which we commonly call "*Miranda* warnings*,*" any statements made by a suspect during a custodial interrogation are inadmissible at trial. *See id.* The critical question is whether Horst made the statements during the course of a custodial interrogation.

A "custodial interrogation" occurs when "questioning [is] initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." *Miranda*, 384 U.S. at 444. "An interrogation is custodial if, based on all the surrounding circumstances, a reasonable person under the circumstances would believe that he or she was in police custody of the degree associated with formal arrest." *State v. Vue*, 797 N.W.2d 5, 10-11 (Minn. 2011). In considering whether an interrogation is custodial, courts consider the totality of the circumstances. *Id.* at 11.

6

Deciding whether an interrogation is custodial is a mixed question of law and fact. *See State v. Sterling*, 834 N.W.2d 162, 167-68 (Minn. 2013). It requires an appellate court to examine a district court's factual findings for clear error, but to review independently the legal conclusion regarding whether the interrogation was custodial. *See id.* If the district court applies the correct legal standard, we grant "considerable, but not unlimited, deference to the [district] court's fact-specific resolution" of whether the interrogation was custodial. *Id.* at 168 (internal quotation marks omitted). However, if the district court errs in its conclusion about the necessity of a *Miranda* warning, we will "award a new trial unless the error [was] harmless beyond a reasonable doubt." *Id.* at 171.

To determine whether questioning has occurred in a custodial setting, we have identified a number of facts that are "indicative of custody." *Vue*, 797 N.W.2d at 11. Such facts include:

> (1) the police interviewing the suspect at the police station; (2) the suspect being told he or she is a prime suspect in a crime; (3) the police restraining the suspect[']s freedom of movement; (4) the suspect making a significantly incriminating statement; (5) the presence of multiple officers; and (6) a gun pointing at the suspect.

*Id.* (internal quotation marks omitted). Other facts, if present, suggest a non-custodial environment. Such facts include: (1) questioning the suspect at home; (2) stating that the suspect is not under arrest; (3) letting the suspect leave the station without hindrance; (4) briefly questioning the suspect; (5) permitting the suspect to leave at any time; (6) conducting the interview in a nonthreatening environment; and (7) allowing the suspect to make phone calls. *Id.* An interrogation that begins as non-custodial can become custodial during the course of questioning. *See State v. Champion*, 533 N.W.2d 40, 43 (Minn. 1995).

7

The district court denied Horst's motion because it concluded that the interview was non-custodial. In support of its decision, the district court specifically found that Horst was asked, not forced, to accompany the officers to the police station; she was questioned in an unlocked conference room rather than a secure interrogation room; she had possession of her personal belongings during the interview; and she freely and voluntarily left the police station after the interview.

Having independently reviewed the facts, we reach the same conclusion as the district court. Before the questioning began, the officers asked Horst and A.P. to accompany them to the police station to answer questions. The officers did not tell either of them that they were required to come. Once they arrived, a single investigator interviewed Horst in a non-secure conference room containing a telephone and a door without a lock. The investigator allowed Horst to keep her purse, which contained a cellphone. Horst twice left the interview room to go to the restroom, though an officer accompanied her each time.[1] At the end of the interview, Horst left the police station without hindrance.

Horst also did not make any significantly incriminating statements during the course of the interview, and the questioning became more persistent only when it was apparent to the investigators interviewing Horst and A.P. that there were inconsistencies between their stories. Even so, the investigators never told Horst that she was a suspect. In fact,

---

[1] The district court clearly erred when it found that Horst did not have an escort when she went to the restroom during the interview. The erroneous factual finding, however, does not affect our conclusion that the interview was non-custodial.

8

consistent with treating her as a grieving widow, the investigator notified Horst about available services, including a chaplain with whom she could consult and a nonprofit organization that aids survivors. These circumstances, viewed as a whole, are more consistent with a non-custodial interview than custodial interrogation.

Horst argues that the district court failed to address other relevant facts that were suggestive of a custodial setting. For example, Horst points out that the investigators had already begun to investigate Brandon's death as a homicide by the time the interview occurred, and consistent with the general requirement for custodial interrogations, the investigator recorded the interview. *See State v. Scales*, 518 N.W.2d 587, 592 (Minn. 1994) (requiring officers to record custodial interviews with suspects). Horst also emphasizes that the investigator's tone became more accusatory as the interview progressed. These facts, in Horst's view, would lead a reasonable person in Horst's position to conclude that she was in police custody, subject to the conditions normally associated with formal arrest. We disagree.

To be sure, the district court's findings did not address every fact upon which Horst relies, and some of the facts are suggestive of a custodial setting. But a district court is not required to discuss every fact that is relevant to a determination of custody so long as it considers the totality of the circumstances and makes sufficient findings to support its decision. *See, e.g.*, *Sterling*, 834 N.W.2d at 168-71. Nor does a "coercive environment" transform routine questioning into a custodial interrogation in the absence of indicia of formal arrest or restraint of the suspect's freedom of movement. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). In fact, we have concluded that an interview conducted under

9

similar circumstances did not require a *Miranda* warning because it occurred in a non-custodial setting. *See State v. Thompson*, 788 N.W.2d 485, 492 (Minn. 2010) (concluding that questioning was non-custodial when the suspect "was interviewed at a police station," "voluntarily came to the station for the interview, was told he was not under arrest, was free to leave, was provided water, did not confess, and was not arrested immediately following the initial interview"). Horst does not provide us with a compelling reason to reach a different conclusion here.

Horst's argument hinges on emphasizing some facts—such as, the interview occurred at a police station, the tone of the questioning became increasingly accusatory, and an officer twice accompanied her to the bathroom—to the exclusion of other facts. However, we have rejected claims that these facts, standing alone, conclusively establish that a suspect is in custody. *See, e.g.*, *Vue*, 797 N.W.2d at 11 (stating that the "mere fact that an interrogation occurs at the police station does not by itself require a determination that the questioning was custodial in nature"). Moreover, whether a person is in custody must be evaluated under the totality of the circumstances, not based on facts that, when viewed in isolation, may be suggestive of a custodial environment. *See J.D.B. v. North Carolina*, 564 U.S. 261, 270-71 (2011).

Our "independent review" of the totality of the circumstances, *see Sterling*, 834 N.W.2d at 167-68, leads us to conclude that Horst was not in custody when she made the statements that were the subject of her pretrial suppression motion. Accordingly, the district court did not err when it denied Horst's motion.

III.

The second question presented by this case is whether the warrantless seizure of Horst's cellphone violated her rights under the Fourth Amendment to the United States Constitution and Article I, Section 10 of the Minnesota Constitution. Toward the end of the interview, when the investigator became skeptical of Horst's version of events, he seized Horst's cellphone without first obtaining a warrant. At a pretrial hearing, the district court denied Horst's motion to suppress the electronic data recovered from the cellphone.

The United States Constitution and the Minnesota Constitution both prohibit unreasonable searches and seizures. U.S. Const. amend. IV; Minn. Const. art. I, § 10. In general, warrantless searches and seizures are unreasonable in the absence of a legally recognized exception to the warrant requirement. *See United States v. Place*, 462 U.S. 696, 701 (1983); *Katz v. United States*, 389 U.S. 347, 357 (1967). Horst's challenge in this case is to the seizure of her cellphone, not the search of it, because after seizing it, the officers obtained a warrant before searching its contents. *See Horton v. California*, 496 U.S. 128, 133 (1990) ("The right to security in person and property protected by the Fourth Amendment may be invaded in quite different ways by searches and seizures."). In upholding the seizure, the district court relied on the exigency exception to the warrant requirement, reasoning that an exigency existed because of the "possibility of imminent destruction or removal" of the data after the investigator and Horst discussed "texts and calls with individuals, including [Brandon] and [A.P.]," during the interview.

To determine whether the investigator faced an emergency that justified acting without a warrant, we look at the totality of the circumstances. *Missouri v. McNeely*, ___

11

U.S. ___, ___, 133 S. Ct. 1552, 1559 (2013) (citing *Illinois v. McArthur*, 531 U.S. 326, 331 (2001)); *State v. Stavish*, 868 N.W.2d 670, 676 (Minn. 2015). The State has the burden of showing that exigent circumstances justified the seizure. *See State v. Gray*, 456 N.W.2d 251, 256 (Minn. 1990). In evaluating the district court's decision, we review factual findings for clear error and legal conclusions, including determinations of probable cause, de novo. *See State v. Milton*, 821 N.W.2d 789, 798 (Minn. 2012).

The investigator's seizure of Horst's cellphone deprived her of access to her personal property. *See Horton*, 496 U.S. at 133 ("[A] seizure deprives the individual of dominion over his or her person or property."). The seizure temporarily limited her ability to make calls, send texts, and access her "contacts list," all of which made it more difficult for her to communicate with family members and close friends. Horst argues that, in light of the privacy interests involved, the investigator should have obtained a warrant before seizing the cellphone. We disagree.

According to the Supreme Court, when law-enforcement officers "have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant," the officers may seize the property, "pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it." *Place*, 462 U.S. at 701. The Court applied this principle to the seizure of a person in *Illinois v. McArthur*, 531 U.S. 326, 331-32 (2001). In that case, police officers detained a man for about 2 hours based on their belief, supported by probable cause, that the man had marijuana hidden in his home. *Id.* at 329. Relying on the exigent-circumstances exception, the Court held that it was reasonable for the officers to temporarily seize the man while the officers obtained

12

a search warrant. *Id.* at 331, 337; *see also State v. Holland*, 865 N.W.2d 666, 670 n.3 (Minn. 2015) (citing cases in which exigent circumstances justified a "temporary seizure").

The seizure in this case, like the seizure in *McArthur*, was justified by exigent circumstances. Here, the investigator had probable cause to believe that the cellphone contained evidence of a crime. *See McArthur*, 531 U.S. at 331 (explaining that the police "had probable cause to believe that McArthur's trailer home contained evidence of a crime"). Indeed, Horst has never questioned the existence of probable cause, only whether the investigator could constitutionally seize the cellphone without first obtaining a warrant. The seizure was also "for a limited period of time"—that is, only 1 day—until the investigator could obtain the warrant. *Id.* Finally, the investigator "had good reason to fear that" Horst might destroy some of the data on the cellphone, particularly because, during the interview, the two of them had discussed texts and calls from the night of the murder. *Id.*

It is significant that the item seized was a cellphone. As the Supreme Court recently observed, the owner of a cellphone or other mobile digital device can quickly and easily destroy the data contained on such a device. *See Riley v. California*, ___ U.S. ___, ___, 134 S.Ct. 2473, 2486 (2014) (stating that the appellants' concession that the officers could have "seized and secured" their cellphones "to prevent destruction of the evidence while seeking a warrant" was "sensible"). Horst could have readily erased text messages and call logs or physically destroyed the cellphone altogether if the investigator had not seized it

during the interview.[2]  *See, e.g.*, *United States v. Brown*, 701 F.3d 120, 127 (4th Cir. 2012) ("[I]t was entirely reasonable for the officers to seize Brown's laptop . . . to prevent either it or its contents from being damaged or destroyed.").

Horst's position is that no exigency existed under these facts because the investigator had ample time to secure a warrant.  For support, Horst relies heavily on *Missouri v. McNeely*, ___ U.S. ___, 133 S. Ct. 1552 (2013), a case in which the Supreme Court rejected the existence of a single-factor exigency based on the the fact that alcohol in a person's bloodstream dissipates over time.  *Id.* at ___, 133 S. Ct. at 1563.  Instead, the Court continued to adhere to a case-by-case analysis, stating that "the Fourth Amendment mandates" that police officers obtain a warrant, provided they can "reasonably" do so "without significantly undermining the efficacy of the search."  *Id.* at ___, 133 S. Ct. at 1561.

The Court in *McNeely* also observed that, with advances in technology, police officers are able to obtain a warrant in some jurisdictions without physically appearing before a judge.  *See id.* at 1562.  Horst asserts that the investigator conducting the interview or another officer could have requested an electronic warrant to seize the cellphone before she left the police station because Minn. R. Crim. P. 36.01 allows officers to apply for warrants by "facsimile or electronic transmission" and present oral testimony "via telephone, radio, or other similar means of communication."  She points out that the

---

[2]    In fact, Horst had already erased some text messages that the police later recovered. The State's ability to recover text messages and other digital data did not negate the exigency, however, because there was no guarantee that the State would recover the digital evidence.  It just so happens that in this case it did.

14

investigator took multiple breaks during the course of the interview, even after the two of them discussed calls and texts, giving the investigator sufficient time to request a warrant.

For three reasons, we conclude that Horst's argument is unconvincing. First, the investigator did not have reason to believe that Horst's cellphone contained evidence of a crime until after he discovered discrepancies in Horst's story and the interview had progressed to a discussion of Horst's texts and calls. The investigators became suspicious only after comparing the accounts given by Horst and A.P. As the investigator who interviewed Horst stated at trial, once the investigators compared the stories, it became apparent that "something was being omitted" and that Horst was not "being completely forthcoming."

Second, the investigator did not know if, or when, Horst would terminate the interview. As we have already concluded, the officers did not place Horst into custody before, during, or immediately after the interview, so it was within Horst's discretion to end the interview and leave the police station. If she had done so, she could have promptly destroyed the evidence contained on the cellphone.

Third, despite technological innovations that allow officers to obtain warrants more quickly, *McNeely* recognizes that "[w]arrants inevitably take some time for police officers or prosecutors to complete and for . . . judges to review." ___ U.S. at ___, 133 S. Ct. at 1562. Even though Minnesota permits oral testimony in support of a warrant, Minn. R. Crim. P. 36.03 requires the preparation of a "duplicate original warrant." To secure a warrant while Horst was in the interview room, Rule 36 would have required the investigator to interrupt the interview, draft a warrant application, and then call the judge

15

to provide oral testimony, all the while hoping that Horst remained in the unlocked conference room. The judge may have then taken time to consider the application. Each of these steps risked destruction of the evidence on the cellphone, which was in Horst's possession at the time.

For these reasons, we conclude that, under the totality of the circumstances, an exigency existed that required preemptive action by the investigator to ensure that Horst could not destroy the digital evidence on the cellphone. Accordingly, we affirm the district court's denial of Horst's motion to suppress the evidence found during the search of the cellphone.[3]

IV.

The third question presented by this case is whether four search warrants, each of which the district court approved, violated Horst's rights because they lacked particularity and a finite temporal scope. The State obtained warrants that granted it access to Horst's medical records from six separate health-care providers over an 8-year period to refute Horst's claims that she had miscarried due to Brandon's alleged abuse. Here, we need not decide whether the search warrants were overly broad in their scope because, even if they were, there would be nothing to suppress, as the information obtained by the search warrants was never admitted at trial.

---

[3] Horst suggests that the investigator simply could have "delayed her ride back to South St. Paul" while he obtained a warrant. The flaw in this suggestion is that it would have required law enforcement to detain *both* Horst and her personal property without a warrant, rather than just seize the cellphone during the period necessary to obtain a search warrant.

16

In a criminal case, the remedy for an illegal search or seizure is generally limited to the suppression of illegally obtained evidence. *See Mapp v. Ohio*, 367 U.S. 643, 657 (1961); *State v. Carter*, 697 N.W.2d 199, 212 (Minn. 2005). This rule, more commonly known as the exclusionary rule, also extends to the "fruits" of an illegal search or seizure. *Wong Sun v. U.S.*, 371 U.S. 471, 484-86 (1963). The remedy of exclusion is unavailable here, however, because the State agreed not to "get into" the information contained in the medical records at Horst's trial, and Horst concedes that "the records themselves were [never] offered into evidence."

Horst nevertheless argues that the State's mere "access" to the privileged medical information was prejudicial. As an example, Horst claims that police investigators and prosecutors "rummaged through over one thousand pages of records to formulate their theories." Such a general claim, however, does not invoke the exclusionary rule because it does not identify any *evidence* requiring suppression from Horst's trial. Nor is there a legal basis for reversal even though the State "used" the medical records when it formulated its theory of the case, struck a deal with Allen, asked questions of witnesses about Horst's health, and prepared its opening and closing arguments. The remedy that Horst requests, which essentially would have required the State to "unlearn" the information it obtained from the execution of the search warrants, is beyond the scope of the exclusionary rule. *See Hudson v. Michigan*, 547 U.S. 586, 591-92 (2006) (discussing the exclusion of evidence as "a last resort," and stating that some evidence is too "attenuated" from the constitutional violation to justify exclusion); *United States v. Leon*, 468 U.S. 897, 907 n.6 (1984) (describing the exclusionary rule as "a rule of *evidence*" (emphasis added)).

17

The only conceivable "fruit" of the allegedly illegal search warrants relates to Allen's testimony, and specifically his decision to cooperate with the State. *See Wong Sun*, 371 U.S. at 484-86. While testifying at the plea hearing in his own case, Allen stated that, when he "learned that [Horst had] never [been] pregnant," it affected his decision to cooperate with the State. It is not clear from the record, however, how Allen learned of this fact. There is no evidence establishing that the State ever showed Horst's medical records to Allen. And significantly, Allen did not make such a statement at Horst's trial. Because Allen's testimony never touched on information from Horst's medical records, there was nothing to suppress from Allen's testimony.

Horst alternatively argues that the allegedly defective warrants constituted structural error requiring a new trial, which according to Horst is the only way to adequately protect her rights under the Fourth Amendment to the United States Constitution and Article I, Section 10 of the Minnesota Constitution. However, we have long held that an error in admitting evidence, even if it is of constitutional magnitude, is a trial error that requires an assessment of prejudice as a precondition to granting relief.[4] *See, e.g.*, *State v. Nelson*, 355 N.W.2d 134, 137 (Minn. 1984) (applying harmless-error analysis to evidence allegedly admitted in violation of the Fourth Amendment); *see also Chambers v. Maroney*, 399 U.S.

---

[4] To the extent that Horst makes a separate substantive-due-process claim challenging the allegedly defective warrants, we review the claim for plain error because she did not raise this argument before the district court. *See State v. Rossberg*, 851 N.W.2d 609, 618 (Minn. 2014). Because Horst's substantive-due-process argument is without merit, she is not entitled to relief on this claim. *See County of Sacramento v. Lewis*, 523 U.S. 833 (1998).

18

42, 52-53 (1970) (same). In light of Horst's argument that the search warrants resulted in a violation of her constitutional rights, *see* U.S. Const., amend. IV; Minn. Const. art. I, § 10, we review the alleged error under the harmless-beyond-a-reasonable-doubt standard. This standard requires us to determine whether the verdict was "surely unattributable to the error." *State v. Juarez*, 572 N.W.2d 286, 292 (Minn. 1997).

Applying the harmless-beyond-a-reasonable-doubt standard to the facts of this case, we conclude that the verdict was surely unattributable to the error. As already noted, no evidence from the allegedly illegal search was admitted at Horst's trial, so the jury logically could not have relied on any illegally obtained evidence in finding her guilty of Brandon's murder. Moreover, even if some of the evidence influenced the State's presentation of its case, the evidence was sufficiently overwhelming that no reasonable jury would have reached a different conclusion. There was testimony from multiple witnesses, including Allen, that Horst actively participated in the plan to kill Brandon, purchased the items necessary to carry out the murder, personally handed the murder weapon to Allen, and even offered to pay Allen and S.K. from Brandon's life-insurance proceeds for their roles in carrying out the crime. Accordingly, we conclude that Horst is not entitled to relief on her defective-warrants claim.

V.

The fourth question presented by this case is whether the district court erred when it failed to give an accomplice-corroboration instruction to the jury. Minnesota law prohibits a conviction based solely on the uncorroborated testimony of an accomplice. Minn. Stat. § 634.04 (2014) ("A conviction cannot be had upon the testimony of an

19

accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense . . . .").  Based on this statutory prohibition, we have required district courts "to instruct juries on accomplice testimony in any criminal case in which it is reasonable to consider any witness against the defendant to be an accomplice."  *State v. Strommen*, 648 N.W.2d 681, 689 (Minn. 2002).  The instruction informs the jury that an accomplice's testimony must be "corroborated by other evidence that tends to convict the defendant of the crime."  *State v. Lee*, 683 N.W.2d 309, 316 n.6 (Minn. 2004) (quoting 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 3.18 (4th ed. 1999)).  If a witness "could have been indicted and convicted for the crime with which the accused is charged," then a district court must give an accomplice-corroboration instruction.  *Id.* at 314.

Horst argues that Allen, S.K., K., and A.P., all of whom testified against her at trial, were accomplices to Brandon's murder.  The State agrees that the district court should have given an accomplice-corroboration instruction in light of Allen's testimony, but disagrees that S.K., K., and A.P. were accomplices.  In this case, we need not decide whether an accomplice-corroboration instruction was required for all four witnesses, because even if it was, the failure to give such an instruction did not affect Horst's substantial rights.

It is undisputed that Horst did not request an accomplice-corroboration instruction.  Therefore, our review is for plain error, which means that relief is available only if (1) there was error; (2) the error was plain; and (3) the error affected Horst's substantial rights.  *See State v. Clark*, 755 N.W.2d 241, 251-52 (Minn. 2008).  With respect to the substantial-rights requirement, Horst bears the burden of establishing that there is "a reasonable

20

likelihood that the absence of the error would have had a significant effect on the jury's verdict." *Id.* at 252 (internal quotation marks omitted). If the first three requirements of the plain-error test have been met, then we consider whether reversal is required to ensure the fairness and integrity of the judicial process. *Id.*

We have held that, even in the absence of a request by the defendant, it is plainly erroneous for a district court to fail to give an accomplice-corroboration instruction when the facts warrant it. *Id.* Therefore, we must determine whether the district court's error affected Horst's substantial rights—in other words, did it have a significant effect on the jury's decision? When evaluating the impact of the failure to give an accomplice-corroboration instruction, we have examined "whether the testimony of the accomplice was corroborated by significant evidence, whether the accomplice testified in exchange for leniency, whether the prosecution emphasized the accomplice's testimony in closing argument, and whether the court gave the jury general witness credibility instructions." *State v. Jackson*, 746 N.W.2d 894, 899 (Minn. 2008) (internal quotation marks omitted).

The first factor is whether, and to what extent, other evidence corroborated an accomplice's testimony. The State presented evidence of text messages exchanged between Allen and Horst. These messages corroborated Allen's testimony that Horst instructed him to wait in the basement, gave him a gun, and encouraged him to carry out the crime regardless of his reservations. A store receipt and video footage corroborated Allen's recollection that Horst left Walgreens immediately after Allen called A.P. and sent a text to Horst stating that the job had been "done." This evidence also substantiated A.P.'s testimony about the chronology of events on the night of the murder, including what

21

prompted A.P. and Horst to leave Walgreen's. As to the testimony of S.K. and K., receipts and transaction logs recorded the items that the group purchased at Kmart on the day of the murder, which corroborated what these two witnesses said at Horst's trial, including the fact that Horst paid for the items.

The second factor is whether the witnesses testified in exchange for leniency. Allen negotiated a plea deal. He agreed to cooperate fully with the State and to testify in exchange for pleading guilty to second-degree murder and acquiescing to a sentence of 40 years in prison. The plea deal was a significant benefit for Allen, and it certainly could have influenced his testimony against Horst, because he was facing a sentence of life imprisonment without the possibility of release for the offense of first-degree premeditated murder. Even without the accomplice-corroboration instruction, however, the jury was aware that Allen had made an agreement with the State, as he testified about it at trial. The jury was therefore fully informed when it weighed Allen's credibility.

Law-enforcement officials also discussed with S.K. and K. how a failure to cooperate in the investigation might impact them. K. testified that officers told him that he would be "fine" as long as he "cooperated" with the prosecution. S.K. said that one investigator pressured him by asking whether he was "in the circle or out of the circle" and threatening multiple times to call his probation officer. Unlike Allen, however, S.K. and K. were never charged with a significant crime, so it is less likely that they were persuaded to give unreliable testimony against Horst. In any event, as with Allen, the jury was aware of how law-enforcement officials had secured S.K.'s and K.'s cooperation, so it was able to fully consider those circumstances when assessing S.K.'s and K.'s credibility. There

was no evidence to suggest that A.P., the other alleged accomplice, was granted leniency by the State or otherwise received anything in exchange for her cooperation.

The third factor is whether the State emphasized the testimony of the accomplices in its closing argument. The State acknowledged in closing that Allen was "a liar, a manipulator, a fantasiz[e]r, [and] a felon." In fact, the State emphasized the other corroborating evidence—including the bank records showing the purchases, the texts between Allen and Horst, and Horst's actions right after the murder—to convince the jury that Allen's testimony was credible. A fair reading of the transcript of the closing argument shows that the State did not unduly emphasize the testimony of the accomplices over other evidence. In sum, by discussing all of the evidence pointing to Horst's guilt, the State did not encourage the jury to rely solely on Allen's, S.K.'s, K.'s, or A.P.'s testimony.

Finally, and perhaps most importantly, the district court gave a general witness-credibility instruction to the jury. The jurors were instructed that they needed to consider each witness's "interest or lack of interest in the outcome of [the] case" and whether each had "something to gain or lose." This instruction ensured that the jury was "alerted . . . to the potential for conflicting motivations behind certain testimony." *Lee*, 683 N.W.2d at 317.

Considering all of these factors, there is not a reasonable likelihood that the jury's verdict would have been any different had the district court given an accomplice-corroboration instruction to the jury. Accordingly, Horst has failed to show that her substantial rights were affected by the district court's failure to give such an instruction.

23

VI.

The fifth question presented by this case is whether the evidence was sufficient to support Horst's conviction of first-degree premeditated murder. In urging us to reverse her conviction, Horst would have us apply the two-step analysis for circumstantial evidence to evaluate the sufficiency of the evidence. *See, e.g.*, *State v. Andersen*, 784 N.W.2d 320, 329-30 (Minn. 2010). In contrast, the State encourages us to apply the traditional standard because it proved each element of the offense by direct evidence. We are presented with a situation in which either standard could conceivably apply, as some elements of the offense were proved by *both* direct and circumstantial evidence. However, when a disputed element is sufficiently proven by direct evidence alone, as it is here, it is the traditional standard, rather than the circumstantial-evidence standard, that governs. *See State v. Salyers*, 858 N.W.2d 156, 160-61 (Minn. 2015); *State v. Flowers*, 788 N.W.2d 120, 133 n.2 (Minn. 2010).

In *Flowers*, we were faced with the identical question of how to assess the sufficiency of the evidence for a conviction of first-degree premeditated murder established through an accomplice-liability theory. *Flowers*, 788 N.W.2d at 133. The defendant in that case, as here, argued that we should review his conviction under the circumstantial-evidence standard. *See id.* at 133 n.2. We rejected his argument, concluding that the circumstantial-evidence standard did not apply because "[t]he State presented direct evidence on each element of the offense of . . . first-degree premeditated murder." *Id.* Our observation from *Flowers* is equally true in this case, as the State proved each of the disputed elements through witness testimony, which is direct evidence when it reflects a

24

witness's personal observations and allows the jury to find the defendant guilty without having to draw any inferences. *See Bernhardt v. State*, 684 N.W.2d 465, 477 n.11 (Minn. 2004) (defining "direct evidence").

Under the traditional standard, we limit our review to a "painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). For the jury to conclude that Horst was responsible for Brandon's murder under an accomplice-liability theory, the State had to prove the actus reus of accomplice liability: "aid[ing], advis[ing], hir[ing], counsel[ing], or conspir[ing] with or otherwise procur[ing] the other to commit the crime." Minn. Stat. § 609.05, subd. 1. The State also had to prove the mens rea for accomplice liability: Horst's knowledge that Allen would commit a crime and an intent for her presence or actions to further the commission of the crime. *See State v. Milton*, 821 N.W.2d 789, 808 (Minn. 2012).

Horst's statement to multiple witnesses, "I want him dead," was direct evidence of her mens rea. The jury did not need to draw any inferences about the purpose of her actions, because this statement unambiguously indicated that her participation was intended to facilitate Brandon's murder. In addition, Horst's statements to Allen, such as "we can do this" and "how many rounds did you put in him," constituted direct evidence that she knew Allen would kill Brandon.

The State also proved the actus reus of the offense by direct evidence. The act of offering the life-insurance proceeds to Allen was direct evidence that Horst "hir[ed]" or

"procur[ed]" him to commit the murder. Horst's instructions to Allen about how many times to shoot Brandon was direct evidence of "counsel[ing]" and "advis[ing]." Applying the traditional standard here, which requires us to "giv[e] due regard to the presumption of innocence and to the prosecution's burden of proving guilt beyond a reasonable doubt, the jury could reasonably have found [Horst] guilty of the charged offense." *State v. Vang*, 847 N.W.2d 248, 258 (Minn. 2014).

Horst's other insufficiency-of-the-evidence argument also fails. She claims that there was insufficient evidence to corroborate the testimony of her alleged accomplices, Allen, S.K., K., and A.P. *See State v. Clark*, 755 N.W.2d 241, 253 (Minn. 2008) (stating that "evidence is sufficient to corroborate an accomplice's testimony when it is weighty enough to restore confidence in the truth of the accomplice's testimony") (internal quotation marks omitted). As with her claim of instructional error, Horst's argument ignores the extensive corroborating evidence in the record. As noted in Part V, the State presented the jury with text messages and phone records showing that Horst and Allen communicated before and after the murder; a Walgreens receipt and video footage indicating that Horst left Walgreens immediately after Allen informed her that he had killed Brandon; and receipts and transaction logs recording the purchase of items at Kmart that were used in the murder. Therefore, we conclude that the evidence was sufficient to corroborate the testimony of Horst's alleged accomplices and convict her of first-degree premeditated murder.

# VII.

The final question presented by this case is whether the district court abused its discretion when it denied Horst's request to remove a juror for cause. The name of the police investigator who interviewed Horst was mentioned in the State's opening argument, and then midway through the testimony of the first witness, one of the jurors realized that he was personally acquainted with the investigator, whom the State expected to call as a witness. The juror and the investigator were classmates at fire school together in 1999, socialized outside of class, and then worked together in the Roseville Fire Department for approximately 1 year. The juror saw the investigator only once in the years that followed, about 7 years before the trial, when he "said hi" to him.

Once the district court discovered the connection between the juror and the investigator, the court asked the juror four times whether he could impartially evaluate the investigator's testimony, each time using slightly different wording. The juror answered unequivocally that he would be able to do so. When the court finished the questioning, it asked counsel for both sides whether there was "anything else." Neither side elected to ask further questions. After the juror left the courtroom, defense counsel asked the court to excuse the juror for cause. The court denied the request, concluding that, in answering the questions about his "connection" to the investigator, the juror "was pretty clear" and his answers "were not hesitant or reluctant in any way."

The Sixth Amendment to the United States Constitution and Article I, Section 6 of the Minnesota Constitution guarantee the right to a trial by an impartial jury "[i]n all criminal prosecutions." *See generally Duncan v. Louisiana*, 391 U.S. 145, 149 (1968).

27

One ground for challenging a juror for cause is when the juror expresses a "state of mind" that "satisfies the court that the juror cannot try the case impartially and without prejudice to the substantial rights of the challenging party." Minn. R. Crim. P. 26.02, subd. 5(1)1. In reviewing the denial of a request to remove a juror for cause, we grant deference to a district court's determination of whether the juror can be impartial and reverse only if the court abuses its discretion. *See State v. Drieman*, 457 N.W.2d 703, 708-09 (Minn. 1990). We grant particular deference to the district court on a determination of juror impartiality because the question is "essentially one of credibility, and therefore largely one of demeanor." *State v. Logan*, 535 N.W.2d 320, 323 (Minn. 1995) (quoting *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)).

The connection here between the juror and the investigator was tenuous. Even though they had attended school and worked together in the past, they were not close friends and had not interacted with one another in any significant way for approximately 13 years. The limited nature of their relationship supports the district court's conclusion that the juror could be impartial. In addition, the court exercised its judgment only after it repeatedly asked the juror whether he could set aside his "connection" to the investigator, to which the juror answered affirmatively four times without being "hesitant or reluctant in any way." The court was able to assess the juror's body language, tone, and facial expressions when he answered the questions, something we are unable to do. In light of the particular deference we owe to the district court's determination of whether the juror could be impartial, we conclude that the court did not abuse its discretion when it denied Horst's request to remove the juror for cause.

28

## VIII.

For the foregoing reasons, we affirm Horst's conviction of first-degree premeditated murder.

Affirmed.

HUDSON, CHUTICH, JJ., not having been members of this court at the time of submission, took no part in the consideration or decision of this case.