*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A24-1027**

State of Minnesota,
Respondent,

vs.

Jasmine Green,
Appellant.

**Filed June 9, 2025**
**Affirmed**
**Harris, Judge**

Hennepin County District Court
File No. 27-CR-23-7031

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Kristyn Anderson, Minneapolis City Attorney, Lindsey R.R. Danielson, Assistant City Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Richard Schmitz, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Bentley, Presiding Judge; Ede, Judge; and Harris, Judge.

**NONPRECEDENTIAL OPINION**

**HARRIS**, Judge

In this direct appeal from the judgment of conviction for gross-misdemeanor driving while impaired (DWI)–test refusal, appellant argues there was insufficient evidence to sustain her conviction because the state failed to prove beyond a reasonable doubt that law

enforcement had probable cause to believe that she was under the influence of alcohol while driving. We affirm.

**FACTS**

Respondent State of Minnesota charged appellant Jasmine Green with gross-misdemeanor test refusal and misdemeanor DWI under Minnesota Statutes section 169A.20 (2022). Green waived her right to counsel and represented herself at a jury trial. At trial, the jury heard testimony from one law-enforcement officer, Green's sister, and Green. In addition, the state presented the body-worn camera (BWC) footage of the traffic stop. Consistent with applicable law, the following factual recitation is based on the trial evidence, presented in the light most favorable to and consistent with the jury's verdicts.

In March 2023, around 2:00 a.m. in downtown Minneapolis, a Hennepin County Sheriff's Department deputy initiated a traffic stop of a black Cadillac he observed driving 51 miles per hour in a 25-mile-per-hour zone. The Cadillac was driven by Green's sister. When the Cadillac pulled over, Green, who was driving an Audi, pulled over in front of the Cadillac. The deputy testified to conducting "thousands of traffic stops a year" and found it "abnormal" that an additional car would stop while he was conducting a traffic stop. He also testified that he saw both vehicles "changing lanes and going back and forth." The deputy asked the Cadillac driver why she was "driving crazy," and she explained that she was trying to keep up with her sister.

After speaking to the driver of the Cadillac, the deputy approached Green's vehicle. The BWC footage shows the deputy walking up to Green's vehicle and saying, "Unless

2

you want a ticket, just pull over on the side of the road."[1]  In speaking with Green, he observed that she was talking slow, appeared lethargic, and had slurred speech.  He also noticed the odor of alcohol coming from the vehicle.  The deputy informed Green that she was parked illegally, which Green disputed, after which the deputy pointed out the "no parking" sign in front of Green.  The BWC footage shows the deputy asking Green for her license and Green replying, "I don't have to do that."  The deputy testified that an individual in the passenger seat of Green's vehicle admitted he was intoxicated.  The deputy asked Green how much she had to drink, to which she replied, "Umm[,] I'm not going to tell you what I've had to drink tonight, but I'm sober enough to drive."  Then, the deputy asked Green to step out of the car and administered three field sobriety tests: the horizontal gaze nystagmus (HGN) test, the one-leg stand test, and the walk-and-turn test.

***HGN Test***

The deputy testified that the purpose of the HGN test was to see if there was any "involuntary jerking of the eye," also called nystagmus, which indicates the person may be under the influence of alcohol.  He added that the HGN test "is the most accurate exercise" that law enforcement conducts.  He explained that he places his finger "10 to 12 inches from the person's face" and asks them "to follow [his] finger with their eyes only."  The deputy testified that he saw a lack of "smooth pursuit" in both eyes, which indicates that Green's eyes were not following his finger smoothly.  He also saw a "sustained nystagmus

---

[1] It appears from the BWC footage that Green was, in fact, already on the side of the road.

3

in both eyes, and [he] saw nystagmus prior to 45 degrees." The deputy observed a total of six clues of impairment during the HGN test.

***One-Leg Stand Test***

The deputy testified that he then administered the one-leg stand test. He explained that this test is "basically seeing if [the person] follow[s] directions and divide[s] attention between following directions and the actual exercise." The clues that he looks for in this test are the person swaying while balancing, using hands for balance, and not looking at the tip of their toe. The deputy verbally instructed and demonstrated how to complete the test. The BWC footage shows Green standing on one leg with the other raised above the ground for approximately 30 seconds before losing her balance.

The deputy testified that Green "[p]ut her foot down, swayed while balancing and used her hands for balance." The deputy also testified that "she raised her foot probably 12 to 24 inches, a lot higher than [he] demonstrated and instructed." Based on this test, the deputy concluded that Green had shown "[a]nother clue of impairment."

***Walk-and-Turn Test***

Lastly, the deputy testified that he administered the walk-and-turn test, again instructing and demonstrating how to complete the test. He testified that he "instruct[s] the person to put their right foot in front of their left foot and stand heel to toe and put their hands down to their side and[] not leave that stance until [he's] done." During this test, the deputy stated that Green "did not connect heel to toe several times. And then she made 12 steps initially down when [he] instructed nine. And on the way back, she did, again, 12 steps, and [he] instructed nine." He additionally testified that he "narrated" this test by

4

saying "off-step" whenever she did not connect heel-to-toe. The deputy concluded that the clues from this test indicated impairment.

After completing the third field sobriety test, the deputy asked Green to submit to a preliminary chemical test. Green refused and said, "I don't think that I'm not intoxicated . . . and I don't think I have to do a breathalyzer and I'm not going to." The deputy then placed Green under arrest for DWI and escorted her to Hennepin County jail. There, the deputy twice read an implied-consent evidentiary chemical test advisory to Green. He testified that Green "continued to talk over [him] the whole time" and insisted that "she's not legally obligated to take [the chemical test]."

After the state rested its case, Green introduced her sister as a witness before testifying in her own defense. Green testified that she had just gotten off work and met up with her sister and another friend downtown. Because the friend became belligerent, Green and her sister agreed to drop him off and that they would get food afterwards. Green and her sister were following each other on the way but "[a]t some point, [they] weren't following each other." Green had lost her phone and pulled over to locate it; once she found it, she drove back on the road and noticed her sister was pulled over.

Green testified that she called her sister to ask if she wanted her to pull over as well. Green added that they "both have had extremely traumatic experiences with, specifically, [the] Minneapolis Police Department." She also explained that, growing up in Chicago, she had seen terrible things done by the police and, therefore, she pulled over to ensure her sister's safety.

5

The jury found Green guilty of DWI test refusal and not guilty of operating a motor vehicle under the influence of alcohol. The district court sentenced Green to 91 days in the Hennepin County workhouse, stayed for two years.

Green appeals.

**DECISION**

Green argues that the evidence was insufficient to support her conviction for refusal to submit to a chemical test because the deputy lacked probable cause to place her under arrest for DWI. Green also asks us to apply the two-step circumstantial-evidence standard of review to evaluate the sufficiency of the evidence because her defense was based on reasonable inferences drawn from the state's evidence. The state argues that the direct-evidence standard of review applies because it proved each element with direct evidence in the form of the deputy's testimony and BWC footage of the deputy's interaction with Green. We first consider the applicable standard of review and then address Green's sufficiency challenge.

**I.    The direct-evidence standard of review applies.**

For claims challenging the sufficiency of the evidence, "we review the evidence to determine whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged." *State v. Smith*, 9 N.W.3d 543, 564-65 (Minn. 2024) (quotation omitted). We view the evidence in the light most favorable to the verdict, and we assume that the fact-finder disbelieved any evidence that conflicted with the verdict. *State v. Griffin*, 887 N.W.2d 257, 263 (Minn. 2016).

6

The standard of review we apply depends on whether the conviction rests on direct or circumstantial evidence. *State v. Hokanson*, 821 N.W.2d 340, 353 (Minn. 2012). Direct evidence is "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or observation." *State v. Harris*, 895 N.W.2d 592, 599 (Minn. 2017); *Black's Law Dictionary* 699 (11th. ed. 2019). In contrast, circumstantial evidence is "evidence from which the factfinder can infer whether the facts in dispute existed or did not exist." *Harris*, 895 N.W.2d at 599. "[C]ircumstantial evidence always requires an inferential step to prove a fact that is not required with direct evidence." *Id.*

Witness testimony may serve as direct evidence "when it reflects a witness's personal observations and allows the jury to find the defendant guilty without having to draw any inferences." *State v. Horst*, 880 N.W.2d 24, 40 (Minn. 2016); *see State v. Olson*, 887 N.W.2d 692, 700 (Minn. App. 2016) (applying direct evidence standard of review for eyewitness testifying to defendant's alcohol consumption and impaired driving); *State v. Brazil*, 906 N.W.2d 274, 279 (Minn. App. 2017) (stating that direct evidence does not become circumstantial even though some level of inference is required to interpret witness testimony), *rev. denied* (Minn. March 10, 2018). Video evidence may also be considered direct evidence. *See State v. Blevins*, 10 N.W.3d 29, 40 (Minn. 2024) (concluding that "light rail station videos provide direct evidence of what they show"); *see also State v. McCormick*, 835 N.W.2d 498, 507 (Minn. App. 2013) (concluding that a reenactment video was direct evidence of what it showed), *rev. denied* (Minn. Oct. 15, 2013).

Here, the state's case rested entirely on direct evidence: the deputy's eyewitness testimony and his BWC footage. Green contends that the circumstantial evidence standard

of review applies, and cites to our nonprecedential opinion, *State v. Randall*, No. A23-1222, 2024 WL 3405998, at *3 (Minn. App. July 15, 2024), as support. We are not persuaded. *Randall* was not a sufficiency-of-the-evidence appeal; it involved a challenge to the district court's denial of appellant's motion to suppress evidence, which involves a different standard of review. Accordingly, we conclude that the direct-evidence standard of review applies here.

**II.    The state presented sufficient direct evidence to support Green's conviction.**

Green does not contest that she refused a chemical test, but she argues that the evidence was insufficient to support her conviction because the deputy lacked probable cause to make a lawful arrest. We are not persuaded.

When a conviction is supported by direct evidence, "we limit our review to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *Horst*, 880 N.W.2d at 40 (quotation omitted). We assume "that the fact-finder disbelieved any evidence that conflicted with the verdict." *Id.*

Minnesota Statutes section 169A.20, subdivision 2(1), makes it a crime "for any person to refuse to submit to a chemical test . . . of the person's breath under" Minnesota Statutes section 169A.51 (2022), which governs chemical tests for intoxication. A person may be required to submit to a chemical test when the "officer has probable cause to believe the person was driving, operating, or in physical control of a motor vehicle while impaired." *State v. Koppi*, 798 N.W.2d 358, 362 (Minn. 2011) (quotation omitted).

8

"Probable cause to arrest a person for DWI exists when the facts and circumstances available at the time of arrest reasonably warrant a prudent and cautious officer to believe that an individual was driving under the influence." *Reeves v. Comm'r of Pub. Safety*, 751 N.W.2d 117, 120 (Minn. App. 2008). The officer's probable cause determination is based on the totality of the circumstances. *Id.* at 120. An officer needs only one objective indication of intoxication to constitute probable cause to believe a person is under the influence. *Otto v. Comm'r of Pub. Safety*, 924 N.W.2d 658, 661 (Minn. App. 2019). Determining the existence of probable cause is an objective inquiry. *Koppi*, 798 N.W.2d at 363.

To prove that the deputy here had probable cause to believe that Green was driving while impaired, the state presented evidence of the officer's direct observations of Green's erratic driving and behavior. He first observed Green and her sister speeding (going 51 miles per hour in a 25-mile-per-hour zone) and changing lanes at approximately 2:00 a.m., right after bar's have typically closed in Minneapolis. Next, as the deputy spoke with Green he observed lethargy, slurred speech, and an odor of alcohol emanating from the vehicle. The state also introduced BWC footage supporting the deputy's testimony about Green. And the deputy testified that, based on his training and experience, Green's behavior was indicative of impairment. All of this evidence is direct evidence of the totality of the facts and circumstances known to the officers, and, if true, proves without inference that there was probable cause to believe Green was driving while impaired. *See Olson*, 887 N.W.2d at 700 (concluding that an officer's direct observations of indicia of impairment and testimony based on those observations are direct evidence of impairment).

9

Green argues that the deputy's testimony is "irreconcilably inconsistent on the issue of whether he observed [her] speeding" and is contradicted by the BWC footage. Although we are not persuaded that there is inconsistency in the direct evidence regarding the deputy's observation that Green drove erratically and reached speeds of 51 miles per hour in a 25-mile-per-hour zone, we acknowledge that some of the deputy's testimony about Green's performance on the field sobriety tests is not corroborated by the BWC footage. For example, according to the deputy, Green performed poorly on the one-leg stand test by placing her foot down, swaying while balancing, and using her hands for balance. But the BWC footage does not show any of this. In fact, the BWC footage shows that Green maintained her balance for approximately 30 seconds before she began to sway. However, Green can be heard on the BWC footage slurring her words as she is counting, and the officer's testimony regarding the walk-and-turn test is consistent with what is depicted in the BWC footage. Additionally, the deputy observed multiple indicia of impairment, and testified that, based on his training and experience, the erratic driving behavior exhibited by Green, coupled with the deputy's observations of Green during the field sobriety tests, led the deputy to believe that she was impaired.

Applying the direct-evidence standard and viewing the evidence in the light most favorable to the verdict, we conclude the evidence at trial was sufficient to prove beyond a reasonable doubt that law enforcement had probable cause to believe that Green was driving while impaired. The deputy observed erratic and high-speed driving, as well as physical indicia of impairment including observed lethargy, slurred speech, and an odor of alcohol emanating from the vehicle. The state introduced BWC footage that supports these

observations. We have held that driving conduct and physical indicia similar to those exhibited by Green can support probable cause of intoxication. *See Otto*, 924 N.W.2d at 661 (holding that "[e]rratic driving and failing to observe traffic laws can be indicia of intoxication . . . and doing so at a time of day when drinking is often found to be involved" (1:20 a.m. on Saturday morning)); *State v. Driscoll*, 427 N.W.2d 263, 265 (Minn. App. 1988) (affirming probable cause where officer noted, among other things, odor of alcohol and failing to follow directions during field sobriety test). Moreover, "[a]n officer needs only one objective indication of intoxication to constitute probable cause to believe a person is under the influence." *State v. Kier*, 678 N.W.2d 672, 678 (Minn. App. 2004) (quotation omitted).

Accordingly, viewing the evidence in the light most favorable to the verdict and assuming the jury disbelieved any evidence inconsistent with that verdict, *Horst*, 880 N.W.2d at 40, the direct evidence was sufficient for the jury to conclude, beyond a reasonable doubt, that the deputy had probable cause to believe that Green was driving while under the influence. Thus, the direct evidence here was sufficient to support Green's gross-misdemeanor conviction of DWI test refusal.

**Affirmed.**