# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A15-2072

State of Minnesota,
Respondent,

vs.

Gregory Allen Olson,
Appellant.

**Filed December 5, 2016**
**Affirmed in part, reversed in part, and remanded**
**Cleary, Chief Judge**

St. Louis County District Court
File No. 69HI-CR-14-823

Lori Swanson, Attorney General, Edwin W. Stockmeyer, Assistant Attorney General, St. Paul, Minnesota; and

Mark S. Rubin, St. Louis County Attorney, Duluth, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Sara J. Euteneuer, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Cleary, Chief Judge; and Jesson, Judge.

## S Y L L A B U S

Statements expressing the mere hope that another person will be subject to a crime of violence, unaccompanied by additional statements or conduct demonstrating that future crimes of violence could follow, do not constitute threats for purposes of establishing the crime of terroristic threats.

## OPINION

**CLEARY**, Chief Judge

Appellant Gregory Allen Olson challenges his conviction for terroristic threats, arguing that his expressions of hope that a state trooper would be shot do not constitute threats for purposes of establishing that crime. Because Olson's statements do not amount to direct or indirect threats of a future crime of violence, they do not constitute threats as a matter of law, and we reverse Olson's terroristic-threats conviction. We affirm Olson's test-refusal and fourth-degree driving-while-impaired (DWI) convictions, and we remand for resentencing.

## FACTS

On October 27, 2014, Olson and his friend, G.R., met at 10:00 a.m. at a bar and had a couple of drinks before starting their trip from Chisago City to Olson's property in St. Louis County. After meeting, they traveled together in one vehicle. Along the way, they stopped at several bars where they consumed beer and mixed drinks. G.R. took over driving at one point because he was a "better driver."

Olson had two more "tall" mixed drinks at a restaurant and bar near Ash Lake where G.R. had a property. Olson and G.R. left the restaurant around 6:00 p.m. As they were leaving, Olson urinated on the restaurant's deck. Olson had trouble walking to the vehicle, and then he started to dance a "little kind of soft shoe shuffle move" in front of the vehicle's headlights as G.R. sat in the driver's seat. Olson fell over twice, striking his head against rocks. Olson was bleeding profusely but rejected G.R.'s efforts to help him and insisted on leaving.

2

They started to drive to G.R.'s property, but Olson told G.R. he wanted to return home to Chisago City. G.R. noticed that Olson's demeanor changed after he fell. While G.R. was driving, Olson asked G.R. several strange questions, such as why G.R. had punched him, and "how come those people jumped me in the parking lot." Olson became more agitated and repeatedly told G.R. he was going the wrong way, although G.R. was following a route familiar to Olson. Olson became nonsensical, threatened to shoot G.R. if he did not pull over, tried to bite G.R.'s right forearm, and even tried to turn the ignition off while the vehicle was travelling 65-70 miles an hour. G.R. tried to restrain Olson with his right arm while driving, but Olson tried to punch G.R., touching G.R.'s jaw. G.R. then pulled the car over, and Olson took the keys. G.R. thought Olson was too drunk to drive and was afraid for his own safety, so he left the scene and called a friend.

At 10:19 p.m., a state trooper observed Olson parked in the vehicle on the right shoulder of Highway 53 with its tires on the fog line. The trooper stopped because the vehicle was a safety hazard. Approaching from the passenger-side window, the trooper noticed that Olson was shaking, covered in blood, and had a golf-ball-sized lump on his head. Olson said that he had been beaten up, but he denied needing medical attention and did not want the trooper to call an ambulance. Olson reported that he was on his way to Forest Lake, but his vehicle faced the opposite direction. The trooper thought Olson was unable to drive and ordered him to stay in his vehicle while he obtained gauze for Olson's head.

3

Olson replied, "You know what I would do if I was you is get your gun out and shoot my ass. . . . Because I'm leaving," and he then fled in his vehicle. The trooper pursued Olson for about one and a half miles north, stopped Olson's vehicle, and placed Olson under arrest. While cuffing Olson, the trooper asked him if he had any weapons, and Olson replied, "Yeah, my pecker. No I don't have any f---ing weapons . . . . Why don't you go get a job? . . . Harassing a person is not a f---ing job." At that point, the trooper noticed that Olson had urinated on himself, had glassy eyes, had an unsteady gait, and was emitting an odor of alcohol. Olson admitted to drinking four or five beers, and he refused to perform field sobriety tests or take a preliminary breath test. While in the patrol car, the trooper read Olson the Minnesota implied-consent advisory:

> TROOPER: Minnesota law requires you to take a test to determine if you are under the influence of alcohol.
> OLSON: I wouldn't trust you assholes for nothing. None of you. You are all assholes. I get beat up, I'm hurting, I stopped to make a phone call, and now I'm the dick. Just leave me alone.
> TROOPER: Refusal to take a test is a crime.
> OLSON: Yeah, you're the loser, pal, not me, you f---ing butt-head dick.
> . . . .
> TROOPER: Do you wish to consult with an attorney?
> OLSON: No. I'm sitting here bleeding to death. That's fine.
> TROOPER: Will you take the breath test? . . .
> OLSON: No, you lying cheating bastards. No, no. None of you. You're just a bunch of sh-t is what you are.
> TROOPER: What is your reason for refusing?
> OLSON: Because you're a bunch of assholes. I don't trust any of you. I did absolutely nothing wrong. I stopped to make a f---ing phone call, and I'm a bastard, bleeding like a stuck pig, and I'm a dick. You know, I don't like you people.

Before the trooper arrived at the hospital, Olson made the following statements:

> It is no wonder people are killing you guys. . . . I truly hope that you are one of the cops that gets their head blown off. . . . I truly hope that because I have done nothing wrong. I stopped to make a f---ing phone call because I got beat up. You guys are assholes.

At the hospital, Olson became agitated, refused medical treatment, and leaned over to the trooper and said, "I hope someone puts a slug in your head, you loser." While the trooper was driving Olson to jail, Olson said, "It is no wonder people are shooting you guys all the time. You see it all the time. There is going to be a lot more."

The trooper testified that after hearing Olson's comments he was concerned for his safety because he did not know what Olson was capable of, and he feared that Olson could find out where he lived. On cross-examination, the trooper admitted that Olson never said that he would do anything to the trooper.

Olson was charged with fleeing a peace officer, terroristic threats,[1] test refusal, fourth-degree DWI, obstructing legal process, failure to obey a peace officer, and fifth-degree assault. In October 2015, Olson went to trial before a jury. The state dismissed the failure-to-obey and obstruction charges. The district court denied Olson's motion to dismiss the terroristic-threats charge at the close of the state's case.

The jury found Olson guilty on all counts. In addition to being sentenced on fleeing a peace officer, terroristic threats, and fifth-degree assault, Olson received stayed

---

[1] The terroristic-threats headnote was changed, effective May 11, 2015, to "threats of violence." 2015 Minn. Laws ch. 21, art. 1, § 109, at 234. The elements of the offense are unchanged. Because the offense here occurred prior to the headnote change, the opinion will use terroristic threats throughout.

jail time for the test-refusal conviction, and was ordered to serve 90 days in jail for the DWI conviction.

Olson now appeals.

## ISSUES

I. Are Olson's expressions of hope that the trooper would be killed sufficient to sustain his conviction of making terroristic threats?

II. Must Olson's conviction for test refusal be reversed because of *Missouri v. McNeely*, state and federal due-process guarantees, and the unconstitutional-conditions doctrine?

III. Is the evidence sufficient to sustain Olson's conviction of fourth-degree driving while impaired?

IV. Did the district court err by imposing sentences on multiple offenses arising out of a single course of conduct?

## ANALYSIS

## I.

Olson challenges the sufficiency of the evidence to support his conviction of terroristic threats, arguing that his statements did not constitute threats to terrorize another as a matter of law. Alternatively, Olson argues that, even if his statements amounted to threats, the state failed to prove that he had a purpose to terrorize. We agree that Olson's statements did not constitute direct or indirect threats to commit a crime of violence. Because reversal is required for insufficient evidence, we do not consider Olson's alternative argument.

6

The question of "[w]hether a defendant's conduct is prohibited by the statute he is charged under is an issue of statutory interpretation that this court reviews de novo." *State v. Smith*, 825 N.W.2d 131, 136 (Minn. App. 2012) (concluding that the defendant's threat to assault the victim with a knife if he did not comply with the demand for money constituted a threat under the terroristic-threats statute) (citing *State v. Colvin*, 645 N.W.2d 449, 452 (Minn. 2002)), *review denied* (Minn. Mar. 19, 2013); *see also State v. Hayes*, 826 N.W.2d 799, 803 (Minn. 2013) (determining that whether the appellant's conduct met the definition of a drive-by shooting presented a question of statutory interpretation that the supreme court reviews de novo). We apply the de novo standard of review to the question of whether Olson's conduct constituted a threat.[2]

A person commits the crime of terroristic threats when that person "threatens, directly or indirectly, to commit any crime of violence with purpose to terrorize another . . . or in a reckless disregard of the risk of causing such terror." Minn. Stat. § 609.713, subd. 1 (2014). "A threat is a declaration of an intention to injure another or

---

[2] The state argues that the direct-evidence standard of review for sufficiency-of-the-evidence claims applies here because there is direct evidence of Olson's threats. The state is correct that Olson's words constitute direct evidence. *State v. Horst*, 880 N.W.2d 24, 40 (Minn. 2016) ("Horst's statement to multiple witnesses, 'I want him dead,' was direct evidence of her mens rea."). But Olson's first argument is not that there was insufficient evidence to support the terroristic-threats charge; he argues that his statements did not constitute threats as a matter of law. *See State v. Ciurleo*, 471 N.W.2d 119, 121 (Minn. App. 1991) (noting pretrial dismissal for lack of probable cause based on legal determination, such as interpretation of statute, is appealable by the state, but a factual dismissal is not). The question of whether a defendant's conduct falls within the conduct prohibited by the statute is a question of statutory construction that we review de novo. *See State v. Murphy*, 545 N.W.2d 909, 914 (Minn. 1996) (applying a de novo standard to the question of whether Murphy's conduct constituted a threat to commit a crime of violence under the terroristic-threats statute).

7

his property by some unlawful act." *State v. Schweppe*, 306 Minn. 395, 399, 237 N.W.2d 609, 613 (1975). The crime threatened must be one of violence, which includes felony assaults and murder. *See* Minn. Stat. § 609.713, subd. 1 (referencing definition of violent crime in section 609.1095, subdivision 1(d)). A threat can be communicated by words or actions. *State v. Franks*, 765 N.W.2d 68, 75 (Minn. 2009); *Murphy*, 545 N.W.2d at 916. Whether a statement is a threat "turns on whether the communication in its context" would reasonably "create apprehension that its originator will act according to its tenor." *Schweppe*, 306 Minn. at 399, 237 N.W.2d at 613 (quotations omitted) (concluding statements defendant made to juvenile's friends about wanting to kill juvenile and his mother constituted threats); *see also State v. Bjergum*, 771 N.W.2d 53, 56 (Minn. App. 2009) (determining that "the statement, 'I am going to kill you' is objectively a threat to commit homicide," but depending on context, the statement might instead convey frustration without intent to kill or even humor), *review denied* (Minn. Nov. 17, 2009).

We agree with Olson that his statements did not constitute direct threats to commit a crime of violence. A threat must communicate that the person will act accordingly. *Schweppe*, 306 Minn. at 399, 237 N.W.2d at 613. For example, in *State v. Dick*, this court concluded that Dick's statements to arresting officers that he would "find out where [they] lived" and kill them was sufficient to constitute terroristic threats. 638 N.W.2d 486, 492 (Minn. App. 2002), *review denied* (Minn. Apr. 16, 2002). Similarly, in *State v. Jones*, this court concluded that Jones's statements to correctional officers that when he got out of prison he was going to find them and "f---" them up,

8

rape them, or kill them, was sufficient to constitute terroristic threats. 451 N.W.2d 55, 57, 63 (Minn. App. 1990), *review denied* (Minn. Feb. 21, 1990).

Unlike these cases, Olson did not say that he would kill the trooper. Olson's statements conveyed his hope that the trooper would have his head blown off, or that someone would put a slug in the trooper's head, and generally predicted more violence against police officers. But Olson's statements did not communicate direct threats that Olson would act accordingly.

It is a closer question whether Olson's statements conveyed indirect threats. We are not persuaded that they did. In *Murphy*, the supreme court considered whether the defendant's "protracted harassment, vandalism, and terrorism" of several court employees, which included spray painting "I'll be back" on property, slashing car tires, displaying dead animal parts, planting fake bombs, and throwing rocks through windows communicated threats that the defendant would act in accordance with the tenor of his physical acts. 545 N.W.2d at 912-16. The defendant's conduct in *Murphy* was sufficient to strongly, but indirectly, convey a threat of future crimes of violence. *Id.* at 916 (explaining that leaving dead animal parts conveys a threat to injure, kill, or commit some other future crime against a person).

In contrast, Olson did not engage in either verbal or physical conduct that indirectly communicated a threat that he would commit future crimes of violence. The record reflects that Olson was confused, whether from drinking or a head injury, and frustrated with his arrest. Although Olson was verbally abusive and his statements were offensive, those statements did not indirectly communicate that Olson had the purpose

9

to commit those acts. Olson's statements did not amount to indirect threats to commit a future crime of violence.

We hold that Olson's statements commenting on recent violent conduct towards police and expressing hope that something similar would happen to the trooper in the future do not constitute threats within the meaning of the terroristic-threats statute when those statements were unaccompanied by additional surrounding statements or conduct demonstrating that future serious crimes of violence could follow. Olson's conviction for terroristic threats must be reversed because the evidence is legally insufficient.[3]

## II.

For the first time on appeal Olson argues that his test-refusal conviction must be reversed because the test-refusal statute is unconstitutional under *Missouri v. McNeely*, 133 S. Ct. 1552, 1563 (2013), because the statute violates federal and state due-process guarantees, and because the statute constitutes an unconstitutional condition. Generally, we only consider issues that the record shows were presented to and considered by the district court. *Roby v. State*, 547 N.W.2d 354, 357 (Minn. 1996). Olson forfeited this issue as it was not raised before the district court. *See State v. Beaulieu*, 859 N.W.2d 275, 279 (Minn. 2015) (clarifying that forfeiture doctrine applies when defendant failed

---

[3] We do not address Olson's alternative argument that the circumstantial evidence is insufficient to prove that Olson had the purpose to terrorize the trooper, or acted in reckless disregard of the risk of causing terror, or his argument that the district court's omission of certain words in the jury instructions constituted plain error. *See Burks v. United States*, 437 U.S. 1, 18, 98 S. Ct. 2141, 2150-51 (1978) (concluding that the double-jeopardy clause bars retrial when conviction is reversed because evidence is legally insufficient).

10

to object or raise issue in district court, but plain-error doctrine permits an appellate court to consider forfeited errors), *cert. denied*, 136 S. Ct. 92 (Oct. 5, 2015).

However, even if we addressed this argument on the merits, Olson's challenge would fail because the Supreme Court affirmed the Minnesota Supreme Court's decision in *State v. Bernard*, which held that the Fourth Amendment permits warrantless breath tests incident to an arrest for drunk driving. 859 N.W.2d 762, 767 (Minn. 2015), *aff'd sub nom. Birchfield v. North Dakota*, 136 S. Ct. 2160, 2184, 2187 (2016). *Bernard* also held that the test-refusal statute does not offend substantive due process. 859 N.W.2d at 773-74. Furthermore, in light of the ruling in *Bernard*, this court held that the argument that a warrantless breath test violates the unconstitutional-conditions doctrine is without merit because the defendant would not be punished under the refusal statute for refusing an unconstitutional search. *State v. Bennett*, 867 N.W.2d 539, 543 (Minn. App. 2015), *review denied* (Minn. Oct. 28, 2015), *cert. denied*, 136 S. Ct. 2542 (June 28, 2016). Olson was lawfully arrested; therefore, any warrantless breath test would have been permitted as a lawful search incident to arrest. Olson's test-refusal conviction is constitutionally valid.

**III.**

Olson next argues that the state failed to prove beyond a reasonable doubt that he drove a vehicle while under the influence of alcohol. We disagree.

It is a crime for a person to drive a motor vehicle when "the person is under the influence of alcohol." Minn. Stat. § 169A.20, subd 1 (2014). To prove that Olson was guilty of impaired driving, the state must show that Olson "had drunk enough alcohol

11

so that . . . [his] ability or capacity to drive was impaired in some way or to some degree." *State v. Shepard*, 481 N.W.2d 560, 562 (Minn. 1992).

Under the traditional standard of review, we "view the evidence in a light most favorable to the verdict to determine 'whether the facts in the record and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt.'" *State v. Salyers*, 858 N.W.2d 156, 160 (Minn. 2015) (quoting *Davis v. State*, 595 N.W.2d 520, 525 (Minn. 1999)). When direct evidence is sufficient to prove a disputed element of the offense, it is unnecessary to apply the circumstantial-evidence standard. *Id.* at 160-61. Direct evidence is evidence based on personal knowledge or observation that, if true, proves a fact without inference. *Bernhardt v. State*, 684 N.W.2d 465, 477 n.11 (Minn. 2004). The traditional standard of review applies here because the state presented direct evidence of Olson's alcohol consumption and impaired driving through eyewitness testimony.

Here the record shows Olson consumed multiple alcoholic beverages over the course of the day—from 10:00 a.m. to around 6:00 p.m. Both G.R. and the trooper testified that, based on their observations, they believed Olson was too drunk to drive. G.R. took over driving and described Olson's unusual behavior at the restaurant just before he fell and hit his head. The trooper detected an odor of alcohol coming from Olson, and observed that Olson was staggering and had an unsteady gait. Olson admitted he had been drinking, and Olson refused to perform field sobriety tests or a preliminary breath test. Based on this record, a jury could reasonably conclude that

Olson was driving while impaired by alcohol. The evidence is sufficient to support his conviction for this offense.

## IV.

Olson argues that the district court erred when it imposed sentences for his convictions of both test refusal and fourth-degree DWI because the two offenses arose out of the same behavioral incident.

"[I]f a person's conduct constitutes more than one offense under the laws of this state, the person may be punished for only one of the offenses." Minn. Stat. § 609.035, subd. 1 (2014). Multiple punishment "refers not to multiple convictions but multiple sentences and any multiple sentences, including concurrent sentences, are barred if section 609.035 applies." *State v. Bookwalter*, 541 N.W.2d 290, 293-94 (Minn. 1995) (quotation omitted). A DWI offense and test-refusal offense arise from a single behavioral incident and the driver may only be punished for one of the offenses, pursuant to section 609.035. *State v. St. John*, 847 N.W.2d 704, 708 (Minn. App. 2014). The state concedes this point and agrees that remand is appropriate so that the district court can correct Olson's sentence.

Olson argues that, on remand, the district court should sentence and impose a punishment on him for the fourth-degree DWI, but not for the test refusal. The state argues for the opposite result. "[S]ection 609.035 contemplates that a defendant will be punished for the 'most serious' of the offenses arising out of a single behavioral incident." *State v. Kebaso*, 713 N.W.2d 317, 322 (Minn. 2006). In determining which offense is the most serious, appellate courts "compare the maximum potential sentence

13

for each of multiple offenses." *St. John*, 847 N.W.2d at 708-09 (quotation omitted) (concluding, where maximum potential sentences for defendant's two gross-misdemeanor offenses are the same, that third-degree DWI is more serious than second-degree test refusal). A fourth-degree DWI offense is a misdemeanor with a maximum penalty of 90 days imprisonment or a fine of $1,000, or both. Minn. Stat. §§ 169A.27, subd. 2, 609.03(3) (2014). The test-refusal offense is a gross misdemeanor and is the more serious offense because it has a maximum sentence of not more than one-year imprisonment or a fine of $3,000, or both. Minn. Stat. §§ 169A.26, subd. 1(b), 609.03(2) (2014). On remand, the district court should vacate the sentence for the DWI and sentence Olson for the test-refusal offense because it is the more serious crime.

## DECISION

Olson's statements did not constitute threats as a matter of law. Accordingly, we reverse Olson's conviction for terroristic threats and direct the district court to vacate his conviction for that offense. We affirm Olson's convictions for test refusal and fourth-degree DWI, but we reverse Olson's sentence for fourth-degree DWI, and remand for sentencing proceedings not inconsistent with this opinion.

**Affirmed in part, reversed in part, and remanded.**