# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A23-1292

State of Minnesota,
Respondent,

vs.

Dustin Brock Metcalfe,
Appellant.

**Filed October 21, 2024**
**Affirmed**
**Harris, Judge**

Nobles County District Court
File No. 53-CR-22-559

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Braden M. Hoefert, Nobles County Attorney, Worthington, Minnesota; and

Travis J. Smith, Special Assistant County Attorney, Slayton, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Laura G. Heinrich, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Smith, Tracy M., Presiding Judge; Harris, Judge; and Klaphake, Judge.[*]

## SYLLABUS

When an appellant argues that trial evidence is insufficient to sustain a conviction but does not raise an issue requiring statutory interpretation, we apply a sufficiency-of-the-

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

evidence standard of review and do not review de novo whether the charged conduct is prohibited by the statute of conviction.

**OPINION**

**HARRIS**, Judge

Appellant argues on direct appeal that the trial evidence was insufficient to sustain his stalking conviction. In the alternative, he argues that he is entitled to a new trial because the prosecutor committed misconduct during closing argument. We affirm.

**FACTS**

Respondent State of Minnesota charged appellant Dustin Brock Metcalfe by amended complaint with one count of threats of violence, in violation of Minnesota Statutes section 609.713, subdivision 1 (2020), and one count of stalking, in violation of Minnesota Statutes section 609.749, subdivision 5(a) (2020). Both charges arose from Metcalfe's phone calls—specifically, six phone calls on or about June 3, 2022—to E.W., an employee of the city of Round Lake, after the city shut off Metcalfe's power.[1] The matter proceeded to a jury trial.

At trial, the state presented testimony from E.W. and her son, M.W., a deputy sheriff. The state presented the recordings of six phone calls Metcalfe made on June 3 to E.W.

---

[1] The state also charged Metcalfe with a second count of threats of violence against E.W.'s son based on the same series of phone calls, but the district court later granted Metcalfe's motion to dismiss for lack of probable cause. In doing so, the district court determined that the communications were not direct or indirect threats to harm E.W.'s son.

E.W. testified that she is the city clerk and treasurer for Round Lake, a town of about 300 people. She explained that the city disconnected Metcalfe's utilities for nonpayment and that she sends out notices about nonpayment. After the city turned off Metcalfe's power, Metcalfe called E.W. and was immediately "confrontational." Because Metcalfe had been "belligerent" in the past, a deputy was present in her office when she took Metcalfe's call. During the next month, Metcalfe made approximately ten phone calls "threatening to take [her] livelihood or take all that [she has]" because the power was turned off. E.W. testified that Metcalfe "said he was going to take everything [she has], [her] job, [her] house, whatever" and that she felt "unsafe."

E.W. testified that the sixth phone call "escalated to violence and referred to [her son] and [herself] and that's where [she] was scared." She also testified that, when Metcalfe said he "would take everything," she believed that he was threatening her life. E.W. said that she needed an order for protection following these phone calls and that a few months later, she decided she "needed to be able to protect [herself]" and got a permit to carry a pistol. She testified that the city council authorized the installation of security measures at city hall, including cameras and bulletproof glass.

During the six recorded phone calls, Metcalfe stated his dissatisfaction with E.W. and Round Lake for shutting off his power and not taking payment from rent assistance or his girlfriend. During the phone calls, E.W. repeatedly tried to give Metcalfe the email address for city hall, as he was requesting. In the first phone call, Metcalfe threatened to sue E.W., Round Lake, and M.W., and E.W. eventually hung up. In the second phone call, Metcalfe continued to ask why Round Lake did not allow his girlfriend to pay the bill and

3

told E.W. that he would send an email from Minnesota rent assistance. In the third phone call, Metcalfe commented on E.W. hanging up on him and asked E.W., "How much longer you think you're gonna have your job once all this comes out and you're sued?" In the fourth phone call, Metcalfe referenced suing E.W. and M.W. being disciplined at work. In the fifth phone call, Metcalfe continued to reference the lawsuit that he had threatened, E.W. and M.W. losing their jobs, and the work his attorney had been doing. Metcalfe also told E.W., "I hate your guts. You're my number one f-cking enemy, dude. So now you need to lose your job and f-cking lose your livelihood like you tried doing to me. I'm gonna take it from you, your son . . . and maybe some other people man."

The disputed statements referencing violence are in the sixth phone call. During the sixth phone call, E.W. offered to spell the email address for city hall and Metcalfe became offended and angry. Although Metcalfe did not expressly threaten to kill or assault E.W., Metcalfe made the following statements:

- Metcalfe described telling a police officer, "Just like when you were at the gas pump in plain clothes and know I'd beat your f-cking ass f-cking sideways 'til your brain drip out your f-cking ear."

- Metcalfe offered to box M.W. if he signed a "legal waiver," stating, "But [M.W.] signs a waiver, we can step into a boxing ring right in Worthington or at the Y, go over to Mankato, go to a boxing club. I'll even let him wear the headgear. I'll knock a couple teeth out and f-cking he won't be working no more. He'll be like, "My name is [M.W.], and my mom is a f-cking [mumbling]."

- Metcalfe said that, when police officers (including M.W.) came to his home: "I stepped aside and got away from my home and got out of the danger zone 'cause, otherwise, they could have just kept walking up and getting their f-cking

4

brains blown out by an AK-47. I'm not gonna put myself in that spot. I could have just sat right up in my room right above the f-cking—right above the front door. He would have walked up, boom and blew a f-cking pop-bottle size f-cking holes in their car and laughed about it."

- Metcalfe also described another interaction with a police officer, stating: "[The police officer] thought he was gonna f-cking stunt on me 'till it was about 30 seconds in the conversation and his whole f-cking tone changed. I said, "Yeah, your tone changed now." Just like the f-ggot at the gas pump who looked down, he's like, "Oh, sh-t. I'm in plain clothes." Yeah, you ain't got dispatch and f-cking a gun on your hip. I'll f-cking stick your head to that f-cking side of that f-cking gas station pump, dude, and leave you lay there, tuck you under your truck quick. And he knew it. Just like your son, he's a big p-ssy."

Metcalfe testified in his own defense. He explained that he called E.W. to get a copy of the energy assistance email and that he planned to go to court to challenge the denial of energy assistance. He also testified that he had a brief interaction with M.W. at some gas pumps and that he wanted M.W. to lose his job for improperly looking up Metcalfe's information. When asked about the violent statements during the sixth phone call, Metcalfe explained that he did not know the police officer, that he wanted the fight with M.W. to be voluntary, and that he has post-traumatic stress disorder (PTSD). On cross-examination, Metcalfe testified that he never owned any firearms and that the purpose of his phone calls was to tell E.W. that he would be suing her.

The jury found Metcalfe guilty of threats of violence and stalking. The district court convicted Metcalfe of stalking and sentenced him to an 18-month prison term, stayed for five years. Metcalfe appeals.

**ISSUES**

I.      Is the evidence sufficient to sustain Metcalfe's conviction of stalking?

II.     Is Metcalfe entitled to a new trial based on alleged prosecutorial misconduct?

**ANALYSIS**

**I.      There is sufficient evidence to sustain Metcalfe's conviction of stalking.**

Metcalfe challenges the sufficiency of the evidence sustaining his conviction of stalking, arguing that his conduct qualified only as a single "act" of making harassing phone calls. Before turning to the sufficiency of the evidence, however, we must first address the parties' dispute about our standard of review.

**A.      Standard of Review**

When a defendant challenges the sufficiency of the evidence supporting a conviction, this court's review turns on whether the state relied on direct or circumstantial evidence to prove an element of the offense. *State v. Jones*, 4 N.W.3d 495, 500 (Minn. 2024). Direct evidence is "evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption," while circumstantial evidence is "evidence from which the factfinder can infer whether the facts in dispute existed or did not exist." *State v. Harris*, 895 N.W.2d 592, 599 (Minn. 2017) (quotations omitted). For direct evidence, "we painstakingly review the record to determine whether that evidence, viewed in the light most favorable to the verdict, was sufficient to permit the jurors to reach the verdict that they did." *State v. Segura*, 2 N.W.3d 142, 155 (Minn. 2024) (quotation omitted). For circumstantial evidence, by contrast, we employ a "heightened two-step process[,]" first identifying the circumstances proved by the state and second

considering whether those circumstances "are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt." *Id.* (quotation omitted).

Although circumstantial evidence is subject to a heightened scrutiny, both standards of review recognize that "[a]s the fact finder, the jury is in a unique position to determine the credibility of the witnesses and weigh the evidence before it" and that a jury may "accept part and reject part of a witness's testimony." *Harris*, 895 N.W.2d at 600 (quotation omitted). As a result, even the heightened circumstantial-evidence standard of review protects those principles by "requir[ing] an appellate court to winnow down the evidence presented at trial by resolving all questions of fact in favor of the jury's verdict, resulting in a subset of facts that constitute the circumstances proved." *Id.* (quotation omitted). We are not permitted "to re-weigh the evidence and sit, in essence, as a 13th juror." *State v. Reek*, 942 N.W.2d 148, 166 (Minn. 2020).

On appeal, Metcalfe argues that his challenge does not require us to apply either form of sufficiency-of-the-evidence review. He instead contends that we must apply de novo review to whether his conduct falls within the scope of the stalking statute, relying on this court's precedential opinion in *State v. Olson*, 887 N.W.2d 692 (Minn. App. 2016).[2]

---

[2] Metcalfe also argues that the de novo standard of review applies to both the stalking offense and to the threats-of-violence offense. Review of his warrant of commitment, however, reveals that the district court did not enter a conviction for threats-of-violence and, therefore, Metcalfe was never formally adjudicated for that offense. *See Spann v. State*, 740 N.W.2d 570, 573 (Minn. 2007) (stating that the official judgment of conviction may be used as "conclusive evidence of whether an offense has been formally adjudicated). Accordingly, we do not review his sufficiency challenge to the threats-of-violence count.

In that case—which involved a challenge to a conviction of threats of violence[3]—we stated that we would "apply the de novo standard of review to the question of whether [the defendant's] conduct constituted a threat." *Olson*, 887 N.W.2d at 697-98. The state responds that *Olson* is inconsistent with precedent from both this court and the Minnesota Supreme Court.

It is true that, in some cases, a sufficiency-of-the-evidence challenge may "turn[] on the meaning of the statute under which a defendant has been convicted." *State v. Bradley*, 4 N.W.3d 105, 109 (Minn. 2024) (quotation omitted). In such cases, we first determine the meaning of the statute, which presents a question of statutory interpretation that we review de novo. *Id.* Once we construe the statute, we then "apply that meaning to the facts to determine whether there is sufficient evidence to sustain the conviction." *Id.* And in doing so, we apply the direct-evidence or circumstantial-evidence standard of review. *Id.* at 110-11; *see, e.g.*, *State v. Stone*, 995 N.W.2d 617, 622 (Minn. 2023) ("Once the statute is interpreted, we conduct a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." (quotation omitted)). Thus, we apply de novo review to the *meaning* of a statute. But we apply the sufficiency-of-the-evidence

---

*See State v. Ashland*, 287 N.W.2d 649, 650 (Minn. 1979) (declining to consider insufficiency-of-the-evidence claims on offenses for which the district court did not formally adjudicate the defendant guilty and did not impose a sentence).

[3] *Olson* used the term "terroristic threats," the prior name for the current threats-of-violence offense, Minnesota Statutes section 609.713, subdivision 1. *See* 2015 Minn. Laws ch. 21, art. 1, § 109, at 234 (amending the headnote from "Terroristic Threats" to "Threats of Violence"). But the statute has remained substantively identical since *Olson*. *Compare* Minn. Stat. § 609.713, subd. 1, (2022) *with* Minn. Stat. § 609.713, subd. 1 (2014).

framework to determine whether *this particular defendant's conduct* was prohibited by the statute.

The Minnesota Supreme Court recently underscored this distinction. For example, in *Stone*, the defendant challenged the sufficiency of the evidence to support his conviction of possession of a firearm by an ineligible person, arguing that the statute did not prohibit his particular conduct: possessing a group of unassembled and incomplete shotgun parts. 995 N.W.2d at 621. On appeal, the supreme court first interpreted the disputed term— firearm—and held that "a disassembled and incomplete shotgun *can be* a firearm . . . so long as it is an instrument designed for attack or defense that expels a projectile by some explosive force." *Id.* at 626. The supreme court then applied its interpretation to the facts of the case. *Id.* It held that it was a question for the jury whether, in that particular case, the object met the definition of firearm, i.e., that it was 'an instrument designed for attack or defense that expels a projectile by some explosive force.' The Court then applied the direct-evidence standard to the sufficiency of the evidence to support the verdict. *Id.*

In addition, in *Bradley*, the defendant challenged the sufficiency of the evidence to support his conviction of second-degree assault using a dangerous weapon. 4 N.W.3d at 109. A "dangerous weapon" is defined, in relevant part, as a "device or instrumentality that, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm." *Id.* (quoting Minn. Stat. § 609.02, subd. 6 (2022)). As in *Stone*, the defendant argued that "courts determine as a matter of law if an object is a dangerous weapon" under that definition. *Id.* And consistent with its conclusion in *Stone*, the supreme court rejected the defendant's argument and instead applied the direct-evidence standard

9

of review. *Id.* at 109-10. The supreme court explained, "contrary to [the defendant's] claim, we have long held that whether an object was a dangerous weapon based on the manner-of-use definition is a question for the fact-finder." *Id.*

Metcalfe's argument that we consider de novo whether his phone calls to E.W. qualify as stalking mirrors the defendants' arguments that the supreme court rejected in *Stone* and *Bradley*. Metcalf does not raise a question of statutory interpretation. Instead, Metcalfe contends that, as a matter of law, his statements were not threats. We acknowledge that, on its face, Metcalfe's argument aligns with the language we used in *Olson*. *See Olson*, 887 N.W.2d at 701 (stating that "[the defendant's statements] did not constitute threats as a matter of law"). But the conclusion Metcalfe asks us to draw from that language is inconsistent with binding Minnesota Supreme Court precedent governing our standard of review and therefore something we may not do. *Cf. State v. Curtis*, 921 N.W.2d 342, 346 (Minn. 2018) (concluding that this court erred when it did not adhere to supreme court precedent governing the burden of proof). In *Olson* we did not conduct our typical sufficiency review—either for circumstantial evidence or direct evidence—and instead determined, as a matter of law, that the defendant's statements "do not amount to direct or indirect threats of a future crime of violence." *Id.* at 695, 699. And we explicitly rejected the state's argument that we should review the sufficiency of the evidence under the direct-evidence standard of review and instead stated, "The question of whether a defendant's conduct falls within the conduct prohibited by the statute is a question of statutory construction that we review de novo." *Id.* at 698 n.2. Moreover, although we stated in *Olson* that the question of whether the defendant's conduct constituted a threat

10

and was subject to de novo review, we nonetheless applied a sufficiency-of-the-evidence standard of review in analyzing and ultimately reversing the defendant's conviction because "the evidence [was] legally insufficient." 887 N.W.2d at 698-99. We therefore reject Metcalfe's invitation to apply de novo review to analyze whether his conduct qualifies as stalking. And in doing so, we hold that, when an appellant argues that trial evidence is insufficient to sustain a conviction but does not raise an issue requiring statutory interpretation, we apply a sufficiency-of-the-evidence standard of review and do not review de novo whether a defendant's conduct is prohibited by the statute of conviction.

## B.      Sufficiency of Evidence

Having determined the appropriate standard of review, we turn to the sufficiency of the evidence in this case. The stalking statute provides that a person is guilty of a felony if they engage "in stalking . . . which the actor knows or has reason to know would cause the victim under the circumstances to feel terrorized or to fear bodily harm and which does cause this reaction on the part of the victim." Minn. Stat. § 609.749, subd. 5(a) (2020). As relevant here, "'stalking' means two or more acts within a five-year period that violate or attempt to violate . . . [Minnesota Statutes] section 609.79 (obscene or harassing telephone calls)." *Id.*, subd. 5(b)(10) (2020). Metcalfe argues that he engaged in only a single "act" of harassing phone calls and that the state failed to prove that he knew or had reason to know E.W. would feel terrorized. We address his arguments in turn.

### 1.      Metcalfe engaged in two or more acts of repeated phone calls.

Metcalfe first argues that he engaged in only a single "act" of harassing phone calls because the harassing-phone-calls statute already applies to a person who "repeatedly

11

makes telephone calls." Minn. Stat. § 609.79, subd. 1(1)(ii) (2020). Metcalfe does not challenge whether his phone calls qualify as harassing phone calls. He asserts only that he engaged in a single act of repeatedly making such calls. We are unpersuaded.

E.W. testified that the six recorded phone calls occurred over two days: four calls on one day and two calls the following day.[4] In addition, as the state identifies, E.W. testified that Metcalfe called her 10 times over the course of the month before the recorded phone calls. E.W. testified that Metcalfe "was threatening to take [her] livelihood or to take all that [she has]" and that she "felt threatened by that" and therefore talked to the council about what she should do. As a result, we conclude that a jury could reasonably conclude that Metcalfe engaged in at least two acts of repeatedly calling E.W. *See In re Welfare of A.J.B.*, 929 N.W.2d 840, 849 (Minn. 2019) ("An action is done 'repeatedly' when it is done 'again and again.'"); *see also State v. Collins*, 580 N.W.2d 36, 42 (Minn. App. 1998) (defining "repeatedly" in Minnesota Statutes section 609.749, subdivision 2(6) (1996), as "more than once"), *rev. denied* (Minn. July 16, 1998).

---

[4] Metcalfe contends that we are limited to the six recorded phone calls and that we must presume that those calls occurred on a single day based on the jury instructions. But the sufficiency of the evidence to support a conviction is not reviewed in the context of the instructions that the jury receives but about the actual elements of the offense. *See Musacchio v. United States*, 577 U.S. 237, 239, 242-43 (2016) (holding that sufficiency challenge is assessed against actual elements of charged crime, not against elements as erroneously described in jury instructions).

### 2. Metcalfe's conduct demonstrated that he intended to terrorize E.W.

Metcalfe also challenges the sufficiency of the evidence that he knew or should have known that his actions would cause E.W. to "feel terrorized or fear bodily harm." Minn. Stat. § 609.749, subd. 5(a). In this context, to "feel terrorized" means to "feel extreme fear resulting from violence or threats," which means "something more than feeling frightened, threatened, oppressed, persecuted, or intimidated." *State v. Franks*, 765 N.W.2d 68, 74 (Minn. 2009). A defendant's state of mind is generally proven by circumstantial evidence and can be inferred from their words or actions. *State v. Johnson*, 616 N.W.2d 720, 726 (Minn. 2000).

Here, the circumstances proved include the following. First, E.W. believed that Metcalfe would kill her because of Metcalfe's specific violent statements directed at her about M.W. and others. *See Schweppe*, 237 N.W.2d at 614 ("Here, the victim's reaction to the threat was circumstantial evidence relevant to the element of intent of the defendant in making the threat."). Second, when asked about the reasonableness of his violent statements, Metcalfe testified:

> They were nothing besides if a person turns on the news and you push a person to extreme and take away something of his, like their power. That wasn't saying I was going to do anything. So I left my house. If you push people and stuff, is it the best thing to say? No. Do I feel good about it? No. But I was suffering from PTSD and had to go ten months without utilities for no reason. And I caught a lady. It's not my fault that her son was a cop. He's your buddy. And here we are.

Third, Metcalfe's statements were not general statements that he hoped E.W. would die but instead alluded to specific incidents, suggested he had an assault rifle, and expressed

13

his willingness to assault police officers. *Cf. Franks*, 765 N.W.2d at 76 (concluding that defendant's letter-writing campaign, in context of defendant's past terroristic acts towards victim, support a finding that he had reason to know his letters would cause fear of bodily harm or extreme fear). Fourth, M.W. testified that he recognized the incidents that Metcalfe described in the phone calls. And fifth, although E.W. interrupted Metcalfe, attempted to provide the email address he asked for, and laughed at certain comments of his in earlier phone calls, E.W. was silent once Metcalfe began making the violent statements.

Metcalfe contends that the circumstances proved are consistent with the reasonable hypothesis that he did not know E.W. would fear bodily harm or feel extreme fear because his explicit threats focused on a lawsuit and E.W. was "flippant" at points during the conversation. Metcalfe's hypothesis that E.W. would fear only a lawsuit is unreasonable given the violent nature of his statements. Moreover, although Metcalfe is correct that E.W. interrupted him and laughed at his threats of a lawsuit in earlier phone calls, E.W.'s demeanor changed during the sixth phone call once Metcalfe began making the statements described above. Throughout Metcalfe's descriptions of violence, E.W. was silent, and she testified that she was afraid that Metcalfe would kill her. We therefore conclude that the circumstances proved are inconsistent with any reasonable hypothesis other than that Metcalfe knew or should have known his conduct would cause E.W. to feel extreme fear or to fear bodily harm, and thus the evidence was sufficient to sustain Metcalfe's conviction for stalking.

14

**II.    Metcalfe is not entitled to a new trial based on alleged prosecutorial misconduct.**

Alternatively, Metcalfe contends that he is entitled to a new trial because of prosecutorial misconduct.    Metcalfe challenges two statements:   the unobjected-to statement that the jurors should not blame E.W. for being afraid of Metcalfe's phone calls and the objected-to statement that the jury should consider E.W.'s "freedom to be free" from harassment.[5]

For unobjected-to prosecutorial misconduct, "[w]e review the prosecutor's statements under a modified plain error analysis." *State v. Davis*, 982 N.W.2d 716, 726 (Minn. 2022) (citing *State v. Ramey*, 721 N.W.2d 294, 299-300, 302 (Minn. 2006)).  Once a defendant establishes plain error, the burden shifts to the state to show that "the plain error *did not* affect the defendant's substantial rights." *State v. Epps*, 964 N.W.2d 419, 423 (Minn. 2021).  For objected-to prosecutorial misconduct, "we have utilized a harmless-error test, the application of which varies based on the severity of the misconduct." *State v. Carridine*, 812 N.W.2d 130, 150 (Minn. 2012).  Under that test, if the defendant establishes prosecutorial misconduct, we then consider whether that misconduct was harmless beyond a reasonable doubt, for serious misconduct, or, for less serious misconduct, "whether the misconduct likely played a substantial part in influencing the jury to convict." *Id.*

---

[5] Metcalfe does not distinguish his analysis of the two instances of prosecutorial misconduct that he challenges, and the state suggests that we should review both for plain error.  But Metcalfe objected to the state's reference to "freedom" and articulates how that statement alone was improper.  We therefore analyze the statements separately.

First, Metcalfe contends the prosecutor erroneously asked the jurors to place themselves in E.W.'s shoes by telling the jurors not to blame E.W. for her reasonable apprehension. This alleged misconduct appears to be based on the following statements, although Metcalfe does not identify specific quotations in his brief:

> [E.W.] takes that as he's going to kill me. Or he's threatening to kill me. Because [E.W.] said everything that I have is my life, my family, the lives of the people I care about. He's telling me he's going to take everything from me. And can you blame her for coming up with that interpretation? Is that specifically what he says? No, but remember the threat is direct or indirect.

Then, later in the state's closing argument, the state argued:

> [E.W.] obviously was concerned and is concerned that he could follow through on some of these threats. That is an entirely reasonable apprehension to have and I would suggest not blaming her for a second for having that apprehension.

Metcalfe contends that these statements constitute plain error by improperly inviting the jurors to put themselves in E.W.'s shoes, relying on the supreme court's statement that "arguments that invite the jurors to put themselves in the shoes of the victim are considered improper." *State v. Thompson*, 578 N.W.2d 734, 742 (Minn. 1998) (quoting *State v. Johnson*, 324 N.W.2d 199, 202 (Minn. 1982)). We are not persuaded. Contrary to Metcalfe's framing, the prosecutor did not ask the jury to imagine that they are E.W. or to consider what it would be like to receive these phone calls. Rather, the prosecutor appears to have been arguing that E.W.'s apprehension was reasonable. And in fact, as the state argues, the reasonableness of E.W.'s apprehension is an element of threats of violence and thus required to be proved beyond a reasonable doubt. *See State v. Mrozinski*, 971 N.W.2d

16

233, 240 (2022) (requiring the state to prove that, "in context, those words or conduct create[d] a reasonable apprehension that [the defendant] will follow through with or act on the threat"). Accordingly, the prosecutor did not commit misconduct.

Second, Metcalfe challenges the prosecutor's statements during rebuttal about "freedom":

> The Defendant and the defense started the opening about freedom. Freedom is very important. The Defendant is certainly free to sue [E.W.] if he wants. He can sue me. He can sue Nobles County. He's free to do that. But what about [E.W.'s] freedom? And that's the other issue. It's not just the Defendants that have freedom. Everyone has freedom.

Then, after an overruled objection, the state concluded its rebuttal by saying:

> My point there was simply the defense talked about the Defendant's freedom. What about [E.W.'s] freedom? The freedom to be free from terror and abuse and to do your job. That's a freedom that she also has. Thank you.

Metcalfe contends that this argument also improperly asked the jurors to put themselves in E.W.'s shoes and that the prosecutor improperly told the jury to protect E.W.'s rights rather than consider whether the state proved its burden. This is also unpersuasive. Read in context, these statements do not ask the jurors to step into E.W.'s position or impermissibly elicit sympathy for E.W. Rather, the prosecutor's reference to E.W.'s freedom and statement that "everyone has freedom" rebutted the defense's argument about freedom of speech and the American value of freedom, which was a theme of the defense's closing argument. Because the defense raised Metcalfe's freedom during its closing arguments, we conclude that the prosecutor was entitled to rebut that argument and clarify that the jury should consider the effect of Metcalfe's conduct on E.W., which—

17

as explained above—was appropriate for the jury's consideration in evaluating the reasonableness of E.W.'s apprehension as an element of threats of violence. *See id.* Thus, because the prosecutor's statements, considered in context, do not improperly invite the jurors to put themselves in the victim's shoes, Metcalfe has not shown the prosecutor committed misconduct.

In sum, Metcalfe is not entitled to a new trial based on alleged prosecutorial misconduct.

## DECISION

After clarifying the applicable standard of review, and applying that standard, we conclude that there was sufficient evidence to sustain appellant's convictions for stalking and that the state did not commit prosecutorial misconduct, we affirm.

**Affirmed.**